FILED

2019 OCT 22  PM 1:36

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY: _____

1   Mark S. Hardiman (SBN 136602)
    Lee S. Arian (SBN 137306)
2   Katherine A. Bowles (SBN 287426)
    **NELSON HARDIMAN LLP**
3   1100 Glendon Avenue, 14th Floor
    Los Angeles, CA 90024
4   Telephone:   (310) 203-2800
    Facsimile:   (310) 203-2727
5   Email: mhardiman@nelsonhardiman.com
           larian@nelsonhardiman.com
6          kbowles@nelsonhardiman.com

7   Attorneys for Relator
    Advantage Analytics, LLC

8

9               **UNITED STATES DISTRICT COURT**

10     **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

11  UNITED STATES OF AMERICA        CASE NO.: **CV19-9075-JAK(MAAx)**
    *ex rel.* ADVANTAGE
12  ANALYTICS, LLC,                 **COMPLAINT FOR VIOLATIONS OF**
13                                  **THE FALSE CLAIMS ACT, 31 U.S.C.**
                                    **§§ 3729-3733**
14              Plaintiffs,

15         v.                       **(FILED UNDER SEAL PURSUANT**
                                    **TO 31 U.S.C. § 3730(B)(2))**
16
    UNITEDHEALTH GROUP, INC., a     **DEMAND FOR JURY TRIAL**
17  Delaware corporation; COTIVITI
18  HOLDINGS, INC., a Delaware
    Corporation; EQUIAN, LLC, an
19  Indiana Limited Liability Company;
    CHANGE HEALTHCARE, LLC , a
20  Delaware limited liability company;
21  MEDREVIEW, INC., a New York
    corporation; CIOX HEALTH, LLC,
22  a Georgia Corporation; HEALTH
23  MANAGEMENT SYSTEMS, INC.,
    a Texas Corporation; SCIOINSPIRE,
24  CORP., a Delaware Corporation; and
25  OPTUM INC., a Delaware
    Corporation,
26
                Defendants.
27

28



PAID

OCT 22 2019

Clerk, US District Court
COURT 4612

---

COMPLAINT

Plaintiff United States of America ("United States"), by and through Relator Advantage Analytics, LLC ("Relator"), alleges as follows:

## INTRODUCTION

1.     Relator brings this action on behalf of the United States of America against UnitedHealth Group, Inc. ("UHG"), including its Medicare Advantage Organization ("MAO") subsidiaries (collectively "United"), and United's recovery audit contractors ("United RACs")  for treble damages and civil penalties under the False Claims Act, Title 31, United States Code, Sections 3729 – 3732 ("FCA").

2.     From 2017 to the present, United and its United RACs engaged in a massive fraudulent scheme to maximize United's revenue from the Medicare Advantage Program at the expense of both the United States Treasury and hospitals which provide necessary inpatient services to Medicare beneficiaries, including those enrolled in this Medicare managed care program, by knowingly retaining program risk adjustment payments for Hierarchal Condition Categories ("HCC") diagnoses reported by United from inpatient hospital claims for Medicare beneficiaries despite rejecting those HCC diagnoses as a basis for paying the hospitals' claims.

3.     United's fraud scheme was three-pronged.  First, United would report patient HCC diagnoses from the hospitals' inpatient claims to the Center for Medicare & Medicaid Services ("CMS") in order to obtain risk adjustment payments for patients enrolled in United Medicare Advantage products.  Second, United would either deny the hospitals' inpatient claims containing such HCC diagnoses entirely or would use United RACs to audit paid claims and systematically assess and collect "overpayments" on the ground that the patient HCC diagnoses supporting such risk adjustment payments were allegedly medically unsupported and inadequately documented.  Third, despite its obligation under the Medicare Advantage Program to correct any errors in its submitted risk adjustment data, United would fail to delete or correct the patient HCC diagnoses

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

1  supporting its risk adjustment payments that were included in hospital inpatient
2  claims that were denied or that the United RACs' later claim audits determined
3  were erroneous, and would not refund the excess payments that it had received
4  based on such diagnoses to CMS.

5      4.    Instead, by retaining the risk adjustment payments that United had
6  received based on HCC diagnoses reported in denied claims or for which the plan
7  later recouped audit overpayments, United knowingly concealed and improperly
8  avoided repaying to CMS the risk adjustment overpayments that United received
9  based on such diagnoses and which did not increase its cost of covering services
10  for Medicare Advantage patients, and the United RACs conspired with United to
11  conceal and avoid United's resulting obligation to refund such overpayments.  In
12  2017 and 2018 alone, this massive fraud has conservatively caused United to
13  wrongfully retain approximately $1 billion in risk adjustment overpayments that
14  United and the United RACs knew should not have been paid and that United was
15  not entitled to keep.  In addition, United was having its cake and eating it too by
16  keeping the CMS risk adjustment overpayments based on these incorrect HCC
17  diagnoses while at the same time denying hospital claims containing such
18  diagnoses and using United RACs to recover claim overpayments for such
19  diagnoses from the hospitals.

20  **JURISDICTION AND VENUE**

21      5.    This Court has subject matter jurisdiction under 28 U.S.C. § 1345.
22  The Court may exercise personal jurisdiction over United under 31 U.S.C. §
23  3732(a) because it was and is doing business within this District.

24      6.    Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C.
25  § 1391(b) because United transacted business in this District and a substantial part
26  of the events giving rise to the above-captioned action occurred in this District,
27  including United's denial of HCC diagnoses contained in inpatient claims for

28

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

Medicare beneficiaries submitted by hospitals located in this District for which United knowingly retained Medicare Advantage risk adjustment payments.

7.     Prior to filing this complaint, Relator voluntarily disclosed to the United States the information on which the allegations and transactions described in this action are based.

### PARTIES

#### Relator

8.     Relator brings this action on behalf of Plaintiff United States and its agency, the United States Department of Health and Human Services ("DHHS") and its component, CMS, which administers the Medicare Program. At all times material to this action, CMS has been an agency within the DHHS and has administered the Medicare Advantage Program, which paid benefits from funds provided by the Federal Government. CMS provided Medicare benefits to qualified recipients, which included payment of claims to United for its provision of benefits to Medicare Advantage members.

9.     Relator Advantage Analytics, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.  Relator has direct and independent knowledge of United's claim denials of Medicare Advantage patient HCC diagnoses submitted by a group of 40 hospitals and the financial impact of those HCC diagnosis denials on the Medicare Advantage risk adjustment payments received by United for those patients.

#### Defendants

10.     Defendant UnitedHealth Group, Inc. ("UHG") is a Delaware corporation which, on information and belief, has its principal place of business located in Minnetonka, Minnesota.  UHG is a diversified managed health care company that provides a vast array of healthcare products and services through its wholly owned subsidiaries, UnitedHealthcare, Inc., a health insurance company and defendant Optum, Inc., a health services company.  Through its Medicare

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

1   Advantage Organization ("MAO") subsidiaries, UHG operates Medicare
2   Advantage plans in all fifty states which cover care for over 4 million Medicare
3   beneficiaries. Those subsidiaries include the following MAO subsidiaries, all of
4   which are owned and controlled, directly or indirectly, by UHG: (a)
5   UnitedHealthcare of California, Inc., a California corporation, (b)
6   UnitedHealthcare Community Plan, Inc., a Michigan corporation, (c) United
7   HealthCare of Florida, Inc., a Florida corporation, (d) United HealthCare of
8   Georgia, Inc., a Georgia corporation, (e) United HealthCare of the Midwest, Inc., a
9   Missouri corporation, (f) UnitedHealthcare of New England, Inc., a Rhode Island
10  corporation, (g) UnitedHealthcare of New Jersey, Inc., a New Jersey corporation,
11  (h) United HealthCare of Nevada, Inc., a Nevada corporation, (i) UnitedHealthcare
12  of Ohio, Inc., an Ohio corporation, (j) UnitedHealthcare of Pennsylvania, Inc., a
13  Pennsylvania corporation, (k) United HealthCare of Texas, Inc., a Texas
14  corporation, (l) AmeriChoice of New Jersey, Inc., a New Jersey corporation, (m)
15  AmeriChoice of Pennsylvania, Inc., a Pennsylvania corporation, and (n) Oxford
16  Health Plans (NJ), Inc., a New Jersey corporation (collectively "United MAOs"
17  and, with UGH, "United").

18      11.   Defendant Cotiviti Holdings, Inc., doing business as Cotiviti
19  ("Cotiviti"), is a Delaware corporation which, on information and belief, has its
20  principal place of business in Atlanta, Georgia, and is a wholly owned subsidiary
21  of Verscend Technologies, Inc., a Delaware corporation. Between 2017 and the
22  present, Covititi contracted with United MAOs to audit the inpatient claims of
23  hospitals, including Medicare Sample Hospitals ## 2, 3, 5, 7, 8, 10, 17, 19, 20, 22,
24  23, 24, 25, 27, 30, 31, 32, 33, 34, 35, 36, 37, 38 and 40, to determine whether the
25  admissions were medically necessary and whether the reported diagnoses were
26  clinically supported and adequately documented.

27      12.   Defendant OmniClaim, Inc. ("Omni"), is a Massachusetts corporation
28  which, on information and belief, has its principal place of business in Woburn,

5

COMPLAINT

1  Massachusetts, which was acquired by Equian, LLC, an Indiana limited liability
2  company, in February 2018.  Between 2017 and the present, Omni contracted with
3  United MAOs to audit the inpatient claims of hospitals, including Medicare
4  Sample Hospitals ## 1, 2, 3, 5, 6, 7, 8, 9, 10, 12, 13, 14, 16, 19, 20, 21, 23, 25, 27,
5  30, 32, 34, 35, 37 and 40, to determine whether the admissions were medically
6  necessary and whether the reported diagnoses were clinically supported and
7  adequately documented.    .

8       13.    Defendant Change Healthcare, LLC (formerly, Emdeon, Inc.), doing
9  business as Equiclaim ("Equiclaim"), is a Delaware limited liability company
10  which, on information and belief, has its principal place of business in Nashville,
11  Tennessee.  Between 2017 and the present, Equiclaim contracted with United
12  MAOs to audit the inpatient claims of hospitals, including Medicare Sample
13  Hospitals ## 3, 4, 5, 10, 12, 15, 20, 24, 25, 26, 29, 30, 31, and 37 to determine
14  whether the admissions were medically necessary and whether the reported
15  diagnoses were clinically supported and adequately documented.

16       14.    Defendant MedReview, Inc. ("MedReview"), is a New York
17  corporation which, on information and belief, has its principal place of business in
18  New York, New York and is a wholly owned subsidiary of New York County
19  Health Services Review Organization, a New York state peer review organization.
20  Between 2017 and the present, MedReview contracted with UHG and United
21  MAOs to audit the inpatient claims of hospitals, including Medicare Sample
22  Hospitals ## 2, 4, 8, 10, 15, 18, 19, 20, 23, 25, 28, 29, 31, 32, 34 and 38, to
23  determine whether the admissions were medically necessary and whether the
24  reported diagnoses were clinically supported and adequately documented.

25       15.    Defendant Ciox Health, LLC, doing business as Ciox ("Ciox"), is a
26  Georgia corporation which, on information and belief, has its principal place of
27  business in Alpharetta, Georgia.  Between 2017 and the present, Ciox contracted
28  with United MAOs to audit the inpatient claims of hospitals, including Medicare

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

6
COMPLAINT

1  Sample Hospitals ## 3, 5, 8, 10,  12, 25, 26, 27, 30, 35, 36, and 37 to determine

2  whether the admissions were medically necessary and whether the reported

3  diagnoses were clinically supported and adequately documented.

4      16.    Health Management Systems, Inc., doing business as HMS ("HMS"),

5  is a Texas corporation which, on information and belief, has its principal place of

6  business in Irving, Texas and is a wholly owned subsidiary of HMS Holdings

7  Corp., a Delaware corporation. Between 2017 and the present, HMS contracted

8  with United MAOs to audit the inpatient claims of hospitals, including Medicare

9  Sample Hospitals ## 5, 9, 14, 17, 20, 25, 26 and 38, to determine whether the

10  admissions were medically necessary and whether the reported diagnoses were

11  clinically supported and adequately documented.

12      17.    Defendant SCIOInspire, Corp., doing business as SCIO Health

13  Analytics ("SCIO"), is a Delaware corporation which, on information and belief,

14  has its principal place of business in Hartford, Connecticut, and is a wholly owned

15  subsidiary of EXLService Holdings. Inc., a Delaware corporation. Between 2017

16  and the present, SCIO contracted with United MAOs to audit the inpatient claims

17  of hospitals, including Medicare Sample Hospitals ## 5, 8, 13, 16, 20, 23, and 32,

18  to determine whether the admissions were medically necessary and whether the

19  reported diagnoses were clinically supported and adequately documented.

20      18.    Optum, Inc. ("Optum"), is a Delaware Corporation which, on

21  information and belief, has its principal place of business in Eden Prairie,

22  Minnesota, and is a wholly owned subsidiary of defendant UHG.   Between 2017

23  and the present, Optum contracted with United MAOs to audit the inpatient claims

24  of hospitals, including Medicare Sample Hospitals ## 8, 10, 24, 25 and 27, to

25  determine whether the admissions were medically necessary and whether the

26  reported diagnoses were clinically supported and adequately documented.

27

28

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

**STANDING**

19.   Relator is aware of a different and unrelated 2011 *qui tam* lawsuit entitled *U.S. ex rel. Poehling v. UnitedHealth Group, Inc. et al.* (CV 16-08697 MWF (2016 C.D. Cal. 2016) filed against United in connection with its alleged failure to verify the accuracy of provider diagnoses that it reported to CMS to obtain risk adjustment payments for Medicare Advantage patients in which the United States has intervened and which is currently pending in the Central District of California.   Under the FCA, if there is a prior public disclosure (including through a federal lawsuit) of allegations contained in a *qui tam* action, a relator must be the original source of the information underlying his or its lawsuit. 31 U.S.C. § 3730(e)(4)(A)(3).

20.   Relator satisfies the original source requirement for two reasons. First, the time 2017 to present time period during which Relator allege United violated the FCA in this action is different from the 2005- 2017 time period alleged in the *Poehling* lawsuit. This different time period on its own suffices to factually distinguish the present case from *Poehling* because United cannot continue committing fraud simply because it was caught and sued by the government in an earlier FCA action relating to its failure to report accurate provider diagnoses for purposes of risk adjustment payments.

21.   Second, the FCA violations giving rise to this action are factually different from those alleged in *Poehling* and involve a separate and distinct fraud scheme.   The crux of the *Poehling qui tam* suit is the allegation that United failed to "look both ways" in conducting audits by correcting its risk adjustment data only for claim diagnoses that United determined were downcoded, but not for claim diagnoses that it knew or should have known had been upcoded by providers.   Thus, in *Poehling*, United was only selectively correcting claim diagnoses for which it would receive higher risk adjustment payments.

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

22.     Conversely, in this case, Relator does not allege that United was correcting claims one way or the other.  Instead, Relator alleges that United is obtaining risk adjustment payments under false pretenses by submitting patient diagnoses for Medicare Advantage members and then issuing claim denials and overpayment demands to the hospitals for claims based on the same diagnoses.  Therefore, United was not only being paid by CMS based on patient diagnoses that resulted in higher reimbursement, but was also denying the claims containing the same diagnoses or recouping the reimbursement that it paid to the hospitals based on the same diagnoses.  As a result, United received additional CMS funds intended to reimburse the plan for the additional cost of paying for treatment of Medicare patients, who were significantly sicker based on their reported diagnoses, even though United would deny the claims containing such diagnose or would later downcode those diagnoses and aggressively claw back claim payments made to the hospitals who had actually treated the patients.

23.     By actively concealing this scheme from CMS, United falsely represented and certified to CMS that the diagnoses submitted in support of the risk adjustment score to be calculated by CMS for patients were accurate, complete, and truthful even though it had actual knowledge though its claim denials and overpayment audits that the diagnoses were incorrect, but failed to delete or correct those diagnoses from its risk adjustment data.  United thereby continued to represent to CMS that the risk adjustment payments made by CMS was being used to compensate Medicare providers for treating higher risk patients with particular diagnoses when, in fact, United denied the hospitals that compensation.

24.     In other words, Relator does not allege that United merely failed to inform the government of misdiagnoses that would have led to reduced risk adjustment payments, as is the case in *Poehling*.  Rather, Relator alleges that United is knowingly submitting diagnoses to increase risk adjustment payments

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

9

COMPLAINT

1    and misrepresenting that it is compensating the hospitals for claims based on these

2    diagnoses when, in fact, it is denying the hospital claims or extracting the money

3    from the hospitals that it initially paid on those claims for those diagnoses.

4    Therefore, while this case and *Poehling* have some superficial similarities in that

5    they each involve United and Medicare Advantage risk adjustment payments, the

6    cases are otherwise entirely distinguishable.  Further, as detailed below, Relator

7    possesses and has analyzed the unique data in its possession to establish that

8    United is engaged in this distinct scheme to defraud the Medicare Advantage

9    program.

**FACTUAL ALLEGATIONS**

The Medicare Advantage Program

12    25.    Medicare is a federally run health insurance program benefitting those

13    who are age 65 and older and the disabled.  Enacted in 1965, the program initially

14    consisted of Medicare Parts A and B, both insurance programs that cover inpatient

15    and outpatient services, respectively. Under Parts A and B, Medicare pays

16    providers enrolled in these fee-for-service ("FFS") programs based on set fees for

17    each service (or bundle of services) that they provide.

18    26.    In 1997, Congress enacted Medicare Part C, under which Medicare

19    beneficiaries can elect to enroll in a Medicare Advantage plan, a managed care

20    plan administered by a private insurance company that has entered into a contract

21    with CMS to be a MAO.  Medicare Advantage plans provide all Medicare Parts A

22    and B benefits, and most offer additional benefits beyond those covered under the

23    original Medicare program.  Under its federal contract, the MAO is paid a monthly

24    fixed or "capitated" fee by the federal government to care for each Medicare

25    Advantage plan enrollee regardless of the amount or type of health care services

26    the member actually uses.  Over the past few years there has been an upward trend

27    in enrollment in the Medicare Advantage Program.  Currently, about 27% of

28    Medicare beneficiaries are enrolled in Medicare Advantage plans, with the

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

10

COMPLAINT

1    majority enrolled in Medicare Advantage HMOs.

2        27.    Initially, CMS's capitated payments to MAOs were based solely upon

3    enrollee demographic information, such as age and gender.  In 2000, to improve

4    the accuracy and fairness of payments, and to mitigate "cream-skimming" by

5    Medicare Advantage plans (i.e., the preferential selection of the healthiest, low-

6    cost/high return enrollees), CMS began implementing a new Medicare Advantage

7    plan payment model – known as the CMS-Hierarchical Condition Category model

8    ("CMS-HCC") – that uses demographic and diagnostic information to adjust the

9    payment for each plan enrollee by assigning a "risk score," or "risk adjustment

10   factor" ("RAF") score, to each enrollee based on the health risk of each plan

11   enrollee and the predicted expenditures for that enrollee in the following year

12   relative to the national average.    Under this CMS-HCC model, CMS's risk

13   adjustment payments to a MAO are higher for plan enrollees with major medical

14   conditions (e.g., high RAF scores) and lower for healthy enrollees (e.g., low RAF

15   scores).  This new risk adjustment reimbursement model became fully effective in

16   2007.    *See Medicare Managed Care Manual* ("MMCM"), Pub. #  100-16,

17   ("MMCM"), Ch. 7, §§ 20, 50, 70, 70.5.1, Ch. 8, § 50.

18       28.    In order to obtain Medicare risk adjustment payments, CMS requires a

19   MAO to submit accurate diagnosis codes from the International Classification of

20   Diseases, 10th Edition, Clinical Modification ("ICD-10-CM") for each condition

21   that is supported by the enrollee's medical record.  Under the CMS-HHC model,

22   the primary indicator of each enrollee's health status is the ICD-10-CM diagnosis

23   codes assigned by Medicare Advantage plan providers to the enrollee and reported

24   by the MAO in Risk Adjustment Processing System ("RAPS") files submitted at

25   least quarterly to CMS through the agency's Front End Risk Adjustment System

26   (FERAS) and RAPS Database.    Healthy enrollees will have no ICD-10-CM

27   diagnoses codes, while less healthy enrollees may have multiple ICD-10-CM

28   diagnosis codes.    The MAO's reported diagnosis codes drive the RAF scores

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

11

COMPLAINT

1   assigned by CMS to Medicare Advantage enrollees for a particular year and those

2   RAF scores in turn drive CMS's risk adjustment payments to the MAO for those

3   enrollees during the next year.  *See* MMCM, Ch. 7, §§ 110, 120, 120.1.1, 120.2,

4   120.2.3, 120.2.7.

5       29.    CMS groups the ICD-10-CM diagnosis codes that it receives from the

6   MAO plan into separate disease categories known as Hierarchal Condition

7   Categories or HCCs.   The HCCs are based upon the type of disease and the costs

8   of treating that disease.  A plan enrollee may have one or more HCCs.  Based on

9   the enrollee's HCCs and demographics, CMS calculates the RAF score for the

10  enrollee which determines the risk adjustment payment – consisting of the

11  Medicare Advantage plan's base capitation rate multiplied by the enrollee's risk

12  score – to be made to the MAO for that plan enrollee for the next year.  The higher

13  an enrollee's RAF score, the higher the risk adjustment payment.  Generally, only

14  ICD-10-CM codes associated with major medical conditions (e.g., diabetes,

15  cancer, heart disease, kidney failure, respiratory failure, major psychiatric

16  disorders,) will result in increased CMS risk adjustment payments to the MAO.

17  The CMS-HCC models "are prospective in the sense that they use diagnosis

18  information from a base year to predict costs for the next year."  *See* MMCM, Ch.

19  7, §§ 70, 70.1, 110, Ch. 8, § 50.

20      30.    Each calendar year, CMS adjusts each Medicare Advantage plan

21  enrollee's RAF score based on the array of ICD-10-CM diagnoses reported in the

22  MAO's claims during the prior year.   If the provider claims for the enrollee during

23  that year do not contain the same ICD-10-CM diagnosis codes supporting the prior

24  RAF score, then CMS will lower the enrollee's applicable RAF score for the next

25  year.  As stated in the Medicare Managed Care Manual, "Beneficiary risk scores

26  are used to adjust each plan's base payment rate for member health status.   The

27  RAF score is computed for each beneficiary for a given year and applied

28  prospectively.  The RAF score follows the beneficiary for one calendar year."  *See*

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

12

MMCM, Ch. 8, § 50.

31.     The MAO's reporting of ICD-10-CM diagnoses for plan enrollees determines what HCC codes are assigned by CMS to the Medicare Advantage plan enrollees.  CMS is unable to verify the accuracy of ICD-10-CM diagnosis codes when the MAO submits them because the agency is not provided with supporting medical documentation at the time of such submission. Instead, CMS relies upon the MAO to submit accurate and medically supported ICD-10-CM codes diagnoses in the first instance, and also to delete any diagnoses later determined by the MAO to be incorrect because the MAO's reporting of unsupported ICD-10-CM codes for major medical conditions will improperly increase CMS's risk adjustment payments to the MAO.

32.     Unfortunately, this system creates an incentive for MAOs to improperly inflate their enrollees' capitation rates. With data for millions of people being submitted each year, CMS is unable to confirm diagnoses before calculating capitation rates. Instead, the agency accepts the diagnoses as submitted, and then audits some of the self-reported data a few years later to ensure that they are adequately supported by medical documentation. *See* 42 C.F.R. §§ 422.310(e), 422.311; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 79 Fed. Reg. 1918, 2001 (Jan. 10, 2014). These audits have revealed excess payments for unsupported diagnoses steadily increasing over the last decade, reaching an estimated $16.2 billion—nearly ten cents of every dollar paid to MAOs—in 2016 alone. *See* James Cosgrove, U.S. Gov't Accountability Office, GAO-17-761T, *Medicare Advantage Program Integrity: CMS's Efforts to Ensure Proper Payments and Identify and Recover Improper Payments*, 1 (2017), available at https://www.gao.gov/assets/690/ 685934.pdf; James Cosgrove, U.S. Gov't Accountability Office, GAO-13-206, *Medicare Advantage: Substantial Excess Payments Underscore Need for CMS to Improve Accuracy of Risk Score*

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

13

1  *Adjustments*, 9–10 (2013), available at https://www.gao.gov/assets/660/ 651712.

2  pdf.

3      33.    Each year, the MAO must sign an attestation form certifying upon

4  best knowledge, information, and belief that the ICD-10-CM diagnosis codes and

5  other risk adjustment information submitted to CMS were accurate, complete, and

6  truthful.    42 C.F.R. § 422.504(l)(2). The attestation form also contains an

7  acknowledgment by the MAO that the diagnoses submitted directly affect the

8  calculation of CMS risk adjustment payments to the MAO's Medicare Advantage

9  plans.    Under Medicare regulations, this MAO certification is false "when the

10  Medicare Advantage organization has actual knowledge of the falsity of the risk

11  adjustment data or demonstrates either 'reckless disregard' or 'deliberate

12  ignorance' of the truth or falsity of the data." 42 C.F.R. § 422.504(l).    *U.S. v.*

13  *United Healthcare Insurance Company*, 848 F.3d 1161, 1169 (9th Cir. 2016),

14  citing 65 Fed. Reg. 40170, 40268 (June 29, 2000). The importance of accurate

15  data certifications is obvious: if patient diagnoses are overstated, then the

16  capitation payments to MAOs will be improperly inflated.

17      34.    Like all Medicare providers, a MAO must return any overpayments

18  based on its reported risk adjustment data to CMS within 60 days after the date on

19  which it identified it received an overpayment. 42 U.S.C. § 1320a-7k(d).    A

20  MAO's failure to return an overpayment is actionable under the FCA as a reverse

21  false claim. *Id*. at § 1320a-7k(d)(3).

United's Medicare Advantage Fraud

23      35.    Relator Advantage Analytics, LLC is affiliated with a group of 40

24  hospitals in 13 states (collectively, the "Medicare Sample Hospitals") that serve

25  thousands of Medicare Advantage patients, many of whom are beneficiaries of

26  United's Medicare Advantage plans. By helping serve the needs of these Medicare

27  Advantage beneficiaries treated at the Medicare Sample Hospitals, Relator has

28  developed significant expertise with the laws applicable to the Medicare

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

1    Advantage Program as well as the HCC model that governs MAO reimbursement.

2    36.    In 2017, the Medicare Sample Hospitals began receiving an unusual

3    number of overpayment demands from United MAOs based on United RACs'

4    claim audits in connection with their 11,280 claims for healthcare services

5    provided to United's Medicare Advantage beneficiaries.  As one of the biggest

6    Medicare Advantage plans and commercial insurance plans in the United States,

7    United applied significant pressure on these Medicare Sample Hospitals to refund

8    claim payments, either in whole or in part, based on United's and the United

9    RACs' determination that certain diagnoses reported on their claim forms for

10    Medicare Advantage plans were medically unsupported or inadequately

11    documented.    For example, during 2017, United assessed and collected

12    approximately $4.4 million in overpayments based on United RAC claim audits for

13    denied diagnoses from the approximate $12.9 million in reimbursement initially

14    paid to the Medicare Sample Hospitals for their services to Medicare Advantage

15    beneficiaries.

16    37.    While MAO audits and overpayment demands are routine occurrences

17    for a group of 40 hospitals, United's audit overpayment demands to the Medicare

18    Sample Hospitals based on the United RACs' audits were a statistical anomaly

19    compared to its prior history of audits and were also typically initiated well over

20    year after the claims were submitted and paid.  Relator also immediately noticed

21    that a significant number of United's overpayment demands based on the United

22    RACs' audits were based on its denial of Medicare Advantage patient diagnoses

23    that qualified as HCCs which United would have reported for those patients to

24    CMS for Medicare risk adjustment purposes.

25    38.    In 2018, United's and the United RACs' Medicare Advantage audits

26    and overpayment demands to the Medicare Sample Hospitals continued.  In a May

27    2018 provider bulletin, United announced that it was formally implementing a

28    Medicare Advantage risk adjustment data validation ("RADV") audit program

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14th Floor
LOS ANGELES, CALIFORNIA 90024

15

COMPLAINT

1   through its vendor, defendant Ciox, in June 2018 and would be requesting medical

2   records from a random selection of providers within a specified 2017 service date

3   range to check the accuracy of reported patient data, including diagnoses.

4   Likewise, in May 2018, UHG announced that MedReview would begin auditing

5   the validity of diagnosis related group ("DRG") coding on hospital inpatient claims

6   beginning on June 1, 2018.

7       39.    Examples of the United MAOs' and United RACs' denials of

8   diagnoses for Medicare Advantage patients treated at the Medicare Sample

9   Hospitals in 2017 and 2018 include the following:

10          a.    On March 15, 2017, United denied ICD-10 code J96.21 (acute

11  and chronic respiratory failure with hypoxia) as secondary diagnosis which is

12  categorized under HCC 84 for Sample Patient # 4, who was seen and treated at

13  Medicare Sample Hospital # 7 between February 14 and 24, 2017;

14          b.    On September 18, 2017, United denied ICD-10 Code N17.9

15  (acute kidney failure, unspecified) which is categorized under HCC 135 for

16  Sample Patient # 6, who was seen and treated at Medicare Sample Hospital # 38

17  between March 14 and 17, 2017;

18          c.    On October 18, 2017, United denied ICD-10 code I21.4 (non-

19  ST elevation (NSTEMI) myocardial infarction) which is categorized under HCC

20  86 for Sample Patient # 3, who was seen and treated at Medicare Sample Hospital

21  # 18 between March 19 and 22, 2017;

22          d.    On December 4, 2017, United denied ICD 10 code J69.0

23  (pneumonitis due to inhalation of food and vomit) that is classified under HCC 114

24  for Sample Patient # 1, who was seen and treated at Medicare Sample Hospital # 3

25  between June 5 and 10, 2017;

26          e.    On April 12, 2018, United denied an inpatient claim containing

27  ICD-10 codes A4101 (sepsis due to methicillin susceptible staphylococcus aureus)

28  and   R6521(severe sepsis with septic shock) which are grouped under HCC 2,

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

16

COMPLAINT

1  ICD-10 code J690 (pneumonitis due to inhalation of food and vomit) which is
2  grouped under HCC 114, and ICD-10 code J9601 (acute respiratory failure with
3  hypoxia) which is grouped under HCC 84 for Sample Patient # 14, who was seen
4  and treated at Medicare Sample Hospital # 16 between February 9 and 11, 2018;

5         f.     On May 8, 2018, United denied ICD-10 code A41.9 (sepsis,
6  unspecified organism) which is grouped under HCC 2 for Sample Patient # 8, who
7  was seen and treated at Medicare Sample Hospital # 28 between October 18 and
8  26, 2017;

9         g.     On July 27, 2018, United denied ICD-10 code E43 (severe
10  protein calorie malnutrition) which is grouped under HCC 21 for Sample Patient #
11  15, who was seen and treated at Medicare Sample Hospital # 28 between
12  November 2 and 4, 2017.

13         h.     On August 10, 2018, United denied ICD-10 Code A40.3 (sepsis
14  due to streptococcus pneumoniae) which is grouped under HCC 2 for Sample
15  Patient # 7, who was seen and treated at Medicare Sample Hospital # 32 between
16  January 24 and 28, 2018;

17         i.     On August 23,2018, United denied ICD-10 code N1709 (acute
18  kidney failure with tubular necrosis) which is grouped under HCC 135  for Sample
19  Patient # 11, who was seen and treated at Medicare Sample Hospital # 25 between
20  August 20 and 24, 2018;

21         j.     On August 29, 2018, United denied ICD-10 code M4856XA
22  (collapsed vertebra, not elsewhere classified, lumbar region, initial encounter for
23  fracture) which is categorized under HCC 169 for Sample Patient # 2, who was
24  seen and treated at Medicare Sample Hospital # 25 between May 9 and 15, 2018;

25         k.     On September 28, 2018, United denied ICD-10 code
26  I5021(acute systolic (congestive) heart failure) which is grouped under HCC 85 for
27  Sample Patient # 13, who was seen and treated at Medicare Sample Hospital # 26
28  between May 21 and 25, 2018;

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

1    l.    On October 12, 2018, United denied ICD-10 code N17.0 (acute kidney failure with acute tubular necrosis) which is categorized under HCC 135 for Sample Patient # 5, who was seen and treated at Medicare Sample Hospital #18 between June 23 and 28, 2018;

5    m.    On October 26, 2018, United denied ICD-10 A41.9 (sepsis, unspecified organism), which is grouped under HCC 2 for Sample Patient # 9, who was seen and treated at Medicare Sample Hospital # 35 between June 2 and 12, 2018;

9    n.    On February 13, 2019, United denied ICD-10 code A41.9 (sepsis, unspecified organism) which is grouped under HCC 2 for Sample Patient # 10, who was seen and treated at Medicare Sample Hospital # 34 between May 27 and 30, 2018; and

13    o.    On April 11, 2019, United denied ICD-10 code A4151 (sepsis due to escherichia coli) which is grouped under HCC 2 for Sample Patient # 12, who was seen and treated at Medicare Sample Hospital # 8 between April 6 and 9, 2019.

17    40.    Based on the sheer volume of United's overpayment demands to the Medicare Sample Hospitals based on the United RACs' audits of only one subset of United's Medicare beneficiaries – Medicare Advantage patients – and involving the denial of diagnoses previously reported by United to CMS that qualified as HCCs resulting in higher Medicare risk adjustment payments to United for those patients, Relator questioned whether United was correcting and deleting these diagnoses in its prior risk adjustment data submissions to CMS and refunding any risk adjustment overpayments that it received as a result of those diagnoses.  As a result, Relators performed and supervised a complex statistical analysis to determine whether United could obtain the level of CMS risk adjustment payments it was receiving given the rate at which United was later denying HCC diagnoses supporting those payments based on United RAC audits and also denying claims

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

18

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

containing such HCC diagnoses without any payment at all.

a. United Risk Adjustment Overpayments for 2017 Medicare Sample Hospital MA Patients With Denied HCC Diagnoses

41. As reflected in its annual reports, United's Medicare Advantage plans covered 4,430,000 million Medicare beneficiaries in 2017 and 4,940,000 Medicare beneficiaries in 2018. Medicare Advantage paid United an average monthly base rate per member of $816 in 2017 and $842 for 2018. United's total revenue from the Medicare Advantage program was therefore approximately $43.4 billion in 2017 and $49.9 billion in 2018.

42. In order to assess the financial impact of United's and the United RACs' denial of diagnoses that had been previously reported to CMS in support of the risk adjustment payments that United received, Relator first calculated what United's Medicare Advantage risk adjusted payments would have been in 2018 based on the 2017 RAF scores for 509 Medicare Advantage patients for whom claims were submitted at the 40 Medicare Sample Hospitals in 13 states before United's and the United RACs' later audits denied HCC diagnoses for such patients. As set forth in the chart below, after normalization and coding adjustments for the Medicare Sample Hospitals,[1] the average RAF score for these 509 patients was 2.013 which, based on the various regional Medicare Advantage base payment rates, would have resulted in United risk adjusted payments totaling an estimated $10,582,322, with HCC inpatient diagnoses accounting for approximately $3.7 million in reimbursement and the remaining $6.8 million

_____

[1] CMS's normalization factor is a downward adjustment to adjust the Medicare Advantage beneficiaries' RAF scores to that of FFS data so that the average RAF risk score in subsequent years is 1.0 and its coding pattern adjustment recalibrate this FFS coding data. These CMS factors are available at https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/ownloads/announcement2017.pdf.

attributable to HCC diagnoses made in the hospitals' outpatient or post-acute care settings:

| CMS Region | Number of Patients | Sample Patients Average RAF Score | 2018 Region Base Rate | 2018 United MA Payments |
|---|---|---|---|---|
| 10 | 8 | 2.055 | 832.71 | $164,289.35 |
| 24 | 104 | 1.935 | 859.3 | $2,074,941.41 |
| 9 | 13 | 1.946 | 871.5 | $264,604.19 |
| 8 | 45 | 1.877 | 833.92 | $845,248.99 |
| 18 | 31 | 2.350 | 853.13 | $745,738.92 |
| 11 | 1 | 3.254 | 831.05 | $32,449.15 |
| 15 | 12 | 2.392 | 832.1 | $286,609.82 |
| 4 | 144 | 1.964 | 873.77 | $2,965,120.46 |
| 22 | 16 | 1.866 | 901.63 | $323,071.29 |
| 12 | 8 | 2.413 | 842.56 | $195,146.40 |
| 6 | 3 | 2.586 | 839.39 | $78,130.18 |
| 2 | 58 | 2.141 | 837.9 | $1,248,784.79 |
| 17 | 66 | 1.946 | 881.12 | $1,358,187.35 |
| **Totals** | **509** | **2.013** | | **$10,582,322.30** |

43.    Next, Relator calculated the impact on the RAF scores of the 509 Medicare Advantage patients of United's and the United RACs' subsequent audit denials of HCC diagnoses reported by the Medicare Sample Hospitals for such patients. This analysis was limited to United's and the United RACs' denials of HCC inpatient diagnoses only reportable by hospitals (comprising 87% of the denials) and did not include HCC outpatient and post-acute care diagnoses (comprising 13% of the denials) since these latter diagnoses could be reported to United by other providers. The 154 HCC inpatient diagnoses denied by United were as follows:

| HCC | ICD-10 Code | Code Description | Number of Denials |
|---|---|---|---|
| 2 | A419 | Sepsis, unspecified organism | 43 |
| 135 | N170 | Acute kidney failure with tubular necrosis | 37 |
| 21 | E43 | Unspecified severe protein-calorie | 24 |

COMPLAINT

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

| | | malnutrition | |
|---|---|---|---|
| 84 | J9621 | Acute and chronic respiratory failure with hypoxia | 6 |
| 114 | J690 | Pneumonitis due to inhalation of food and vomit | 5 |
| 135 | N179 | Acute kidney failure, unspecified | 5 |
| 114 | J156 | Pneumonia due to other Gram-negative bacteria | 4 |
| 21 | E441 | Mild protein-calorie malnutrition | 3 |
| 86 | I214 | Non-ST elevation (NSTEMI) myocardial infarction | 3 |
| 85 | I5033 | Acute on chronic diastolic (congestive) heart failure | 3 |
| 85 | I5043 | Acute on chronic combined systolic (congestive) and diastolic (congestive) heart failure | 3 |
| 84 | J9600 | Acute respiratory failure, unspecified whether with hypoxia or hypercapnia | 3 |
| 84 | J9601 | Acute respiratory failure with hypoxia | 3 |
| 2 | R6511 | Systemic inflammatory response syndrome (SIRS) of non-infectious origin with acute organ dysfunction | 2 |
| 21 | E440 | Moderate protein-calorie malnutrition | 1 |
| 21 | E46 | Unspecified protein-calorie malnutrition | 1 |
| 84 | I462 | Cardiac arrest due to underlying cardiac condition | 1 |
| 85 | I5021 | Acute systolic (congestive) heart failure | 1 |
| 85 | I5031 | Acute diastolic (congestive) heart failure | 1 |
| 84 | J9620 | Acute and chronic respiratory failure, unspecified whether with hypoxia or hypercapnia | 1 |
| 84 | J9690 | Respiratory failure, unspecified, unspecified whether with hypoxia or hypercapnia | 1 |
| 33 | K567 | Ileus, unspecified | 1 |
| 21 | R64 | Cachexia | 1 |
| 2 | R6520 | Severe sepsis without septic shock | 1 |

44.    The cumulative HCC RAF score for these 2017 HCC diagnosis codes from Medicare Sample Hospitals denied by United FY was 0.579.  On information

21

and belief, United's failure to delete or correct these HCC diagnosis codes submitted to CMS therefore resulted in a risk adjustment overpayment of $3,051,139 with respect to the Medicare Advantage patients treated at the Medicare Sample Hospitals, as follows:

| CMS Region | Number of Patients | Average RAF Score for Denied HCCs | Normalized RAF score | MA coding pattern adjusted score | 2018 Region Base Rate | 2018 United MA Overpayment |
|---|---|---|---|---|---|---|
| 10 | 8 | 0.433 | 0.426 | 0.401 | 832.71 | $32,023.99 |
| 24 | 105 | 0.511 | 0.503 | 0.473 | 859.3 | $512,032.48 |
| 9 | 13 | 0.658 | 0.647 | 0.609 | 871.5 | $82,745.83 |
| 8 | 45 | 0.666 | 0.655 | 0.616 | 833.92 | $277,321.44 |
| 18 | 31 | 0.626 | 0.615 | 0.579 | 853.13 | $183,706.15 |
| 15 | 12 | 0.577 | 0.568 | 0.534 | 832.1 | $63,997.36 |
| 4 | 144 | 0.893 | 0.878 | 0.827 | 873.77 | $1,247,976.44 |
| 22 | 16 | 0.298 | 0.293 | 0.276 | 901.63 | $47,727.46 |
| 12 | 8 | 0.683 | 0.672 | 0.632 | 842.56 | $51,126.07 |
| 2 | 58 | 0.484 | 0.476 | 0.447 | 837.9 | $260,935.21 |
| 17 | 66 | 0.452 | 0.444 | 0.418 | 881.12 | $291,547.43 |
| **Total:** | **509** | | | | | **$3,051,139.85** |

b. <u>United Risk Adjustment Overpayments for 2017 Medicare Sample Hospital MA Patients With Zero Pay Claims</u>

45.     In addition, on information and belief, United also failed to correct or delete the 2017 HCC diagnosis codes that it reported to CMS for 846 Medicare Advantage patients for whom the Medicare Sample Hospitals submitted claims that United paid zero dollars on.  These 417 HCC inpatient diagnoses were as follows:

| HCC | ICD-10 Code | Code Description | Number of Denials |
|---|---|---|---|
| 135 | N179 | Acute kidney failure, unspecified | 56 |
| 135 | N170 | Acute kidney failure with tubular necrosis | 52 |
| 21 | E43 | Unspecified severe protein-calorie malnutrition | 50 |
| 2 | A419 | Sepsis, unspecified organism | 36 |

22

| 21 | E440 | Moderate protein-calorie malnutrition | 27 |
| 21 | E441 | Mild protein-calorie malnutrition | 25 |
| 85 | I5033 | Acute on chronic diastolic (congestive) heart failure | 25 |
| 84 | J9621 | Acute and chronic respiratory failure with hypoxia | 20 |
| 86 | I214 | Non-ST elevation (NSTEMI) myocardial infarction | 14 |
| 84 | J9600 | Acute respiratory failure, unspecified whether with hypoxia or hypercapnia | 13 |
| 84 | J9601 | Acute respiratory failure with hypoxia | 13 |
| 85 | I5023 | Acute on chronic systolic (congestive) heart failure | 12 |
| 85 | I5043 | Acute on chronic combined systolic (congestive) and diastolic (congestive) heart failure | 10 |
| 2 | R6510 | Systemic inflammatory response syndrome (SIRS) of non-infectious origin without acute organ dysfunction | 10 |
| 21 | E46 | Unspecified protein-calorie malnutrition | 8 |
| 84 | J9620 | Acute and chronic respiratory failure, unspecified whether with hypoxia or hypercapnia | 8 |
| 87 | I249 | Acute ischemic heart disease, unspecified | 7 |
| 84 | J9622 | Acute and chronic respiratory failure with hypercapnia | 6 |
| 169 | M4856XA | Collapsed vertebra, not elsewhere classified, lumbar region, initial encounter for fracture | 4 |
| 85 | I5031 | Acute diastolic (congestive) heart failure | 3 |
| 114 | J156 | Pneumonia due to other Gram-negative bacteria | 3 |
| 21 | R64 | Cachexia | 3 |
| 96 | I472 | Ventricular tachycardia | 2 |
| 114 | J690 | Pneumonitis due to inhalation of food and vomit | 2 |
| 84 | J9690 | Respiratory failure, unspecified, unspecified whether with hypoxia or hypercapnia | 2 |
| 33 | K5660 | Unspecified intestinal obstruction | 2 |
| 169 | M4855XA | Collapsed vertebra, not elsewhere classified, thoracolumbar region, initial encounter for | 2 |

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

23

| | | fracture | |
|---|---|---|---|
| 2 | R6520 | Severe sepsis without septic shock | 2 |

46.    The cumulative HCC RAF score for these 2017 HCC diagnosis codes reported in the Medicare Sample Hospitals' claims for which United paid zero was 1.597.  United's failure to delete or correct these HCC diagnosis codes submitted to CMS therefore resulted in a risk adjustment overpayment of $12,723,976.97 with respect to the Medicare Advantage patients treated at the Medicare Sample Hospitals, as follows:

| CMS Region | Number of Patients | Average RAF Score for Zero Pay HCCs | Normalized RAF score | MA coding pattern adjusted score | 2018 Region Base Rate | 2018 United MA Overpayment |
|---|---|---|---|---|---|---|
| 10 | 12 | 1.575 | 1.549 | 1.457 | $832.71 | $174,726.73 |
| 24 | 169 | 1.704 | 1.676 | 1.576 | $859.30 | $2,747,292.30 |
| 9 | 43 | 1.432 | 1.408 | 1.325 | $871.50 | $595,775.48 |
| 8 | 31 | 1.703 | 1.675 | 1.576 | $833.92 | $488,769.95 |
| 18 | 83 | 1.509 | 1.484 | 1.396 | $853.13 | $1,186,277.54 |
| 11 | 238 | 1.572 | 1.546 | 1.454 | $831.05 | $3,451,917.55 |
| 22 | 22 | 1.704 | 1.676 | 1.576 | $901.63 | $375,253.18 |
| 12 | 2 | 0.995 | 0.978 | 0.920 | $842.56 | $18,605.42 |
| 6 | 14 | 1.679 | 1.651 | 1.553 | $839.39 | $219,051.53 |
| 2 | 156 | 1.697 | 1.669 | 1.570 | $837.90 | $2,462,648.30 |
| 17 | 76 | 1.350 | 1.327 | 1.249 | $881.12 | $1,003,659.00 |
| Totals | 846 | | | | | $12,723,976.97 |

b.    Estimated United Risk Adjustment Overpayments for Total 2017 MA Population

47.    While Relator has been unable to confirm whether United was denying HCC diagnosis codes at other hospitals at the same rate as for Medicare Sample Hospitals without correcting or deleting  such those HCC diagnosis codes from its 2017 RAP data ,  an extrapolation of United's denial rate for the Medicare Sample Hospitals to the entire Medicare Advantage population of 4,430,000 million in 2017 results in an estimated annual risk adjustment overpayment of $169,150,945, as follows:

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14th Floor
LOS ANGELES, CALIFORNIA 90024

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

| Total Medicare MA population | 4,430,000 |
|---|---|
| Medicare managed care hospital IP utilization rate | 25% |
| Percentage of Medicare Sample Hospital IP denials with diagnosis code denials | 3% |
| Percentage of Medicare Sample Hospital diagnosis denials with HCC impact | 87% |
| Average RAF score of Medicare Sample Hospital denied HCC diagnosis codes | 0.626 |
| Normalized RAF score of Medicare Sample Hospital denied HCC diagnosis codes | 0.616 |
| MA coding pattern adjusted score | 0.579 |
| Monthly United risk adjustment overpayment for total Medicare MA population | $14,095,912 |
| Yearly United risk adjustment overpayment for total Medicare MA population | $169,150,945 |

48.    Similarly, an extrapolation of United's zero payment rate for the Medicare Sample Hospitals to the entire Medicare Advantage population of 4,430,000 million in 2017 results in an estimated annual risk adjustment overpayment of $899,421,788, as follows:

| Total Medicare MA population | 4,430,000 |
|---|---|
| Medicare managed care hospital IP utilization rate | 25% |
| Percentage of Medicare Sample Hospital IP denials with zero payment | 17% |
| Percentage of Medicare Sample Hospital diagnosis zero pay denials with HCC impact | 32% |
| Average RAF score of Medicare Sample Hospital denied HCC diagnosis codes with zero pay | 1.597 |
| Normalized RAF score of Medicare Sample Hospital denied HCC diagnosis codes with zero pay | 1.570 |

| MA coding pattern adjusted score | 1.477 |
|---|---|
| Monthly United risk adjustment overpayment for total Medicare MA population | $74,951,816 |
| Yearly United risk adjustment overpayment for total Medicare MA population | $899,421,788 |

    c.    United's Retention of MA Overpayments Based on Incorrect HCC Diagnoses That It Knowingly Failed to Correct

49.    Relator's statistical studies demonstrate that when adjusted for denials of Medicare Sample Hospital claims by United based on or including incorrect HCC diagnoses, the risk adjustment payments made to United in 2017 and 2018 would have decreased significantly, thereby creating an obligation on the part of United to correct the HCC diagnoses relied on by CMS to calculate those payments and to pay back to CMS the overpayments made based on those incorrect diagnoses.

50.    On information and belief, United knowingly failed to delete the HCC diagnoses for Medicare Advantage patients treated at the Medicare Sample Hospitals reported to RAPS in 2017 and 2018 that its subsequent claim denials and MAO audits identified as incorrect and failed to refund to CMS the excess risk adjustment payments that it received from CMS based on those diagnoses.  On information and belief, including United's 2018 announcement that its RADV audits would apply to all MA providers, United also knowingly retained risk adjustment overpayments that it received for incorrect HCC diagnoses for Medicare Advantage patients treated at other hospitals that its claim denials and audits identified as incorrect, but that United failed to delete from its prior RAPS submissions for the relevant Medicare Advantage patients.

51.    In 2017 and 2018, United and its MAOs executed the required

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

1  attestations regarding the accuracy of its reported risk adjustment data and were

2  fully aware of their obligation to correct any errors in such data which became

3  known to it at a later time.  United had ample opportunity to correct its 2017 and

4  2018 risk adjustment data submissions to CMS given that following the deadline

5  for submitting the risk adjustment data, there is a reconciliation period created for

6  the very purpose of allowing MAOs to add or delete claims. Furthermore, there is

7  no deadline to return monies owed to the United States to which United is not

8  entitled.

9      52.    Nevertheless, United knowingly concealed that the HCC diagnoses

10  that it submitted to CMS in 2017 and 2018 were false in order to retain increased

11  risk adjustment payments from CMS to which they were not entitled while at the

12  same time denying claims containing the same diagnoses and assessing and

13  collecting overpayments from the Medicare Sample Hospitals and other hospitals

14  based on their denial of the same diagnoses.

15      53.    Relators estimate that as a result of this fraud scheme, United

16  wrongfully retained more than $1 billion of the tax payers' money in 2017 and

17  2018 alone.

## FIRST CAUSE OF ACTION

## FALSE CLAIMS ACT: REVERSE FALSE CLAIMS

## 31 U.S.C. § 3729(a)(1)(G)

## (Against United)

22      54.    The United States repeats and re-alleges the allegations contained in

23  Paragraphs 1 to 53 above as though they are fully set forth in this paragraph.

24      55.    Between 2017 and the present, defendant United knowingly concealed

25  or knowingly and improperly avoided or decreased an obligation to pay or transmit

26  money or property to the United States by failing to delete or correct incorrect

27  diagnoses in the RAPS system that it submitted to CMS to support the Medicare

28  Advantage risk adjustment payments that it received in 2017 and 2018 and failing

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14ᵗʰ Floor
LOS ANGELES, CALIFORNIA 90024

1   to refund the risk adjustment overpayments it received for those years based on

2   those incorrect diagnoses to CMS when it had actual knowledge that those reported

3   diagnoses were incorrect because United had denied the claims containing such

4   diagnoses or because United and the United RACs had subsequently denied those

5   diagnoses in audits of the Medicare Sample Hospitals and other hospitals.

6       56.    By virtue of defendant United's acts of concealment and improper

7   avoidance of its obligation to refund Medicare Advantage risk adjustment

8   payments, the United States incurred damages, according to proof at trial, and

9   therefore is entitled to treble damages under the FCA, plus a civil penalty for each

10  violation of the statute.

**SECOND CAUSE OF ACTION**

**FALSE CLAIMS ACT: CONSPIRACY**

**31 U.S.C. § 3729(a)(1)(C)**

**(Against All Defendants)**

15      57.    The United States repeats and re-alleges the allegations contained in

16  Paragraphs 1 to 56 above as though they are fully set forth in this paragraph.

17      58.    Between 2017 and the present, defendants United, Cotiviti, Equian,

18  Equiclaim, MedReview, Ciox, HMS, SCIO and Optum knowingly combined,

19  conspired, and agreed to violate the FCA by knowingly and improperly avoiding or

20  decreasing United's obligation to pay or transmit money or property to the United

21  States by failing to delete or correct incorrect diagnoses in the RAPS system that

22  United submitted to CMS to support the Medicare Advantage risk adjustment

23  payments that United received in 2017 and 2018 and failing to refund the risk

24  adjustment overpayments that United received for those years based on those

25  incorrect diagnoses to CMS when United and United RACs had actual knowledge

26  that those reported diagnoses were incorrect because United had denied the claims

27  of the Medicare Sample Hospitals and other hospitals containing such diagnoses or

28  because United and the United RACs had subsequently denied those diagnoses in

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14th Floor
LOS ANGELES, CALIFORNIA 90024

28

COMPLAINT

1  audits of the Medicare Sample Hospitals and other hospitals, in violation of Title 31,

2  United States Code, Section 3729(a)(1)(G).

3       59.    By virtue of the participation of defendants United, Cotiviti, Equian,

4  Equiclaim, MedReview, Ciox, HMS, SCIO and Optum in this conspiracy to violate

5  the FCA, the United States incurred damages, according to proof at trial, and

6  therefore is entitled to treble damages under the FCA, plus a civil penalty for each

7  violation of the statute.

8  **PRAYER**

9      **WHEREFORE**, the United States requests that judgment be entered in its

10  favor and against United as follows:

11      1.    On its First Cause of Action for Reverse False Claims, for the amount

12  of the United States' damages, trebled as required by law, together with the

13  maximum civil penalties allowed by law, costs, post-judgment interest, and such

14  other and further relief as the Court may deem appropriate.

15      2.    On its Second Cause of Action for Conspiracy to Violate the FCA, for

16  the amount of the United States' damages, trebled as required by law, together with

17  the maximum civil penalties allowed by law, costs, post-judgment interest, and such

18  other and further relief as the Court may deem appropriate.

19                      Respectfully submitted,

20  Dated:  October 17, 2019        NELSON HARDIMAN LLP

21

22                     By:                        
                              Katherine A. Bowles

23                                Mark S. Hardiman
                              Lee S. Arian

24                                Attorneys for Relator

25                                Advantage Analytics, LLC

26

27

28

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14th Floor
LOS ANGELES, CALIFORNIA 90024

29
COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2

The United States of America hereby demands a trial by jury.

3

Respectfully submitted,

4

Dated:  October 17, 2019

NELSON HARDIMAN LLP

5

6

By:

Katherine A. Bowles

7

Mark S. Hardiman

Lee S. Arian

8

Attorneys for Relator

9

Advantage Analytics, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NELSON HARDIMAN LLP
1100 Glendon Avenue, 14th Floor
LOS ANGELES, CALIFORNIA 90024